# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs May 22, 2013

## STATE OF TENNESSEE v. SAMUEL GLASS

**Appeal from the Criminal Court for Knox County**
**No. 95128A        Bob R. McGee, Judge**

_____

**No. E2012-01699-CCA-R3-CD - Filed August 28, 2013**

_____

In this appeal as of right, the State contends that the trial court erred by setting aside the jury verdicts of attempted second degree murder and entering judgments of acquittal for those counts based upon the doctrine of transferred intent. Also in this appeal, the defendant challenges his convictions of first degree premeditated murder, felony murder, and attempted first degree murder on grounds that the evidence was insufficient to support those convictions. Because the trial court erred by setting aside the jury verdicts of attempted second degree murder, the judgments effecting those verdicts and the 12-year sentences are reinstated. The judgments of the trial court are affirmed in all other respects.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed in Part; Reversed in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and CAMILLE R. MCMULLEN, J., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy E. Wilber, Assistant Attorney General; Randall E. Nichols, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellant, State of Tennessee.

J. Liddell Kirk (on appeal); and William Talman (at trial), Knoxville, Tennessee, for the appellee, Samuel Glass.

## OPINION

The essential facts of this case are largely undisputed. The defendant, Samuel Glass, after a night of riding around with friends, came to the 3928 Porter Avenue residence

where 17-year-old Dachanna Dotson[1] lived with her grandmother and her best friend, Jaye Christopher, and fired an AK-47 toward the residence. Ms. Dotson, Ms. Christopher, and eight-month-old Zymarius Davenport,[2] were on the front porch, and Antonio Miller, a neighbor, was in the front yard at the time of the shooting. The three adult victims scrambled to get into the house, and Ms. Dotson picked Zymarius up as she ran. Ms. Dotson, using her body to shield the infant, suffered two gunshot wounds to her back and died. A Knox County Criminal Court jury convicted the defendant of the first degree premeditated murder and felony murder of Ms. Dotson, the attempted second degree murder of Ms. Christopher, the attempted second degree murder of Zymarius, the attempted first degree murder of Mr. Miller, employing a firearm during the commission of a dangerous felony, and driving on a revoked license.

At trial, Ms. Christopher testified that in June 2010, she lived with Ms. Dotson, whom everyone called "Muffin," in the residence of Ms. Dotson's grandmother. On June 8, 2010, Ms. Dotson's eight-month-old nephew, Zymarius, spent the night at the home. At some point near midnight, Zymarius awoke, fussy and hot, so the girls changed his diaper. Ms. Christopher carried the soiled diaper to the trash can outside the house. Outside, she saw "the Dr. Pepper car and the green and orange Infiniti" driving down the street just past the residence where Mr. Miller lived with his mother, Teretha. Mr. Miller stepped to the curb and fired a single gunshot into the air. He then "hopped in his truck and sped off" in the direction taken by the other cars, "towards Speedway Circle." Ms. Christopher said that she went inside and reported what she had seen to Ms. Dotson, then she went outside to smoke a cigarette. Ms. Dotson followed with Zymarius, who was still fussy. The girls put the baby into his stroller and sat talking on the porch.

Ms. Christopher testified that Mr. Miller returned 10 to 15 minutes later and stopped to talk to the girls. Ms. Christopher said that some time later, she saw "some cars coming down the street, and they shut off their lights so Muffin stands up and she cuts off the porch light." Ms. Christopher identified the approaching cars as the green and orange Infiniti that had driven by earlier and a red Nitro that she knew belonged to Jasmine Woodruff, the mother of Mr. Miller's youngest child. Ms. Christopher said that the cars stopped in front of the house, and the passenger of the Infiniti got out of the car with a large gun, "walked up to the edge of the ramp," and said, "'What n*****.'" Ms. Woodruff then got out of her vehicle and yelled, "'No, Sam, don't do it.'" The man nevertheless started

---

[1]The transcript spelled Ms. Dotson's name "Deshauna." As is the policy of this court, we utilize the spelling set forth in the presentment.

[2]The transcript spells the infant's name "Zymereous." As is the policy of this court, we utilize the spelling included in the presentment.

shooting toward Mr. Miller. Ms. Christopher recalled that Ms. Dotson grabbed Zymarius and ran into the house. Mr. Miller, she said, initially tried to get into his truck, but when he "couldn't get his door open fast enough . . . he ran back on our porch and ran in the door."

Ms. Christopher said that the man eventually stopped shooting, got back into the Infiniti, and the car sped away. The red Nitro was also driven away at a high rate of speed. Ms. Christopher, Mr. Miller, and Ms. Dotson's grandmother each telephoned 9-1-1. Ms. Christopher said that in the aftermath of the shooting, Zymarius lay on the floor "screaming and yelling," and Ms. Dotson lay on the floor, face down and unresponsive. Ms. Christopher was unable to identify the shooter, but she did observe him drop a cellular telephone and some money into the street as he got out of the Infiniti.

Paula Wilkins, the defendant's grandmother, testified that the orange and green Infiniti that Ms. Christopher had seen on Porter Avenue belonged to the defendant but was registered in her name. She said that the car was registered in her name because the defendant did not have a driver's license. Ms. Wilkins said that on the morning of June 9, 2010, the defendant's sister, Tanisha, telephoned and asked if she could bring the Infiniti to Ms. Wilkins' residence because "something happened on Porter and they were looking for a multi colored Infiniti." Ms. Wilkins said that someone, she assumed it to be Tanisha, brought the car to her house while she was still asleep and parked it "in the back drive." Ms. Wilkins said that her neighbors began to call about the strange car soon after. At that point, Ms. Wilkins called a close friend who was also a police officer, who put her in touch with the detective in charge of the investigation into the shooting. Police came and towed the car.

Mr. Miller testified that in June 2010, he lived at 3924 Porter Avenue with his mother and that, at that time, he was serving a six-year probationary term for a conviction of possession with the intent to sell cocaine. He said that Ms. Woodruff was the mother of his son, Kamurion, who was one year old in June 2010. Mr. Miller stated that he knew the defendant from middle school, saying that they "didn't speak to each other but . . . didn't have no beef either." He said that he knew Akeem Dubose as a friend of his "first baby momma," Brittany Quince, and her brother, Sampson Quince. He recalled that he met Alexis Watson when he "hooked up" with Ms. Woodruff. Mr. Dubose's car, a two door Oldsmobile Cutlass, was known as "the Dr. Pepper car" because it bore the Dr. Pepper emblem. The defendant, who went by "Little Sam," drove a green and orange Infiniti.

Mr. Miller testified that in June 2010 he was unemployed and that he and Ms. Woodruff argued because he was unable to provide financial support to their child. Mr. Miller said that he learned through neighborhood gossip that the defendant had labeled him a snitch and that Ms. Woodruff had been "riding" with the defendant. He said that he spoke with Ms. Woodruff via telephone just before midnight on June 8, 2010, about the issue.

During their conversation, she told him to come outside, and when he did, he saw "three cars coming up the street swerving back and forth. So I'm like, what's goin' on? So I see the first car and it's Akeem. Then I see the second car is Little Sam. Then I see the third car, it's my baby momma. She's laughing and stuff, hanging out the window." Mr. Miller said that he became angry because the others were "trying to stunt on him" because he no longer had money since he had quit dealing drugs. "Stunting," he explained, "is like when you got more money than the other person . . . basically, what it's saying is they're trying to call me broke." He said he got into his truck and followed them toward Speedway Circle. At Speedway Circle, he got out of the car, and he and the defendant "had words" before he struck the defendant three times. He got back into his car and drove away despite Ms. Woodruff's trying to block him in.

Mr. Miller testified that when he got back to his residence, Ms. Christopher and Ms. Dotson were on the front porch of their residence, so he stopped to talk to them. Approximately 15 minutes later, the defendant arrived, and Ms. Woodruff pulled in behind him. The defendant jumped from his car, said, "'What's up? What's up?'", and began shooting what appeared to be an AK-47. He described what happened next:

> We all was trying to fit in one door at one time when he started shootin'. And then some kind of way Muffin was still standing up. She had dropped the baby on the ground and she had crawled to the hallway. And then Ms. Arnette hopped on the phone and called the ambulance. I called 9-1-1 on my phone too while I'm sitting there looking at Muffin watching her suffer.

During cross-examination, Mr. Miller denied firing a gun into the air after the three cars drove down the street "stunting," saying, "If I'd had a gun I'm pretty sure I would've shot back at 'em."

Twenty-two-year-old Akeem Dubose said that he had been a friend of the defendant for years and that he met Ms. Woodruff "[t]hrough [the defendant's] baby's momma Jassica." He said that Mr. Miller, who was known as "T.T.," fathered the baby of his friend's sister. Mr. Dubose said that he drove a two-door Cutlass emblazoned with the Dr. Pepper logo that was registered to his cousin, Curtis Cash. Mr. Dubose recalled that on June 8, 2010, he was "[b]eing hot, riding around." He explained that "being hot" meant "[t]rying to look good." He said that he saw the defendant at a paint shop and stopped to talk. The two of them then went to "the local CD man down the street." After visiting the CD man, Mr. Dubose dropped his own car at his grandmother's house and got into the car with the defendant. The two men drove around for a while, and the defendant took him back to his car. Mr. Dubose said that he went home, showered, and changed clothes.

-4-

Sometime later, the defendant telephoned and asked Mr. Dubose to come to the defendant's grandmother's house. He did. He said that Ms. Woodruff arrived at the defendant's grandmother's house a short time later accompanied by young woman named Alexis whom Mr. Dubose had not met before. Mr. Dubose recalled that the group talked briefly before getting into Ms. Woodruff's car. They went to the liquor store and the gas station. Mr. Dubose said that while they were at the gas station, he saw Mr. Miller's ex-girlfriend, Danika, enter the store just behind the defendant. He recalled that "[t]wo seconds later [Ms. Woodruff] g[o]t a call from her baby's father." Ms. Woodruff asked Mr. Dubose and the defendant to go to Buffalo Wild Wings, and he and the defendant indicated a desire to change clothes first.

After changing clothes at their respective residences, the defendant and Mr. Dubose drove separately from Mr. Dubose's mother's house to Buffalo Wild Wings. They parked at a gas station near the restaurant, and the defendant told Mr. Dubose that "Jaz told him that T.T. was like when he see him, you know, what I'm saying it was on site." He said that the statement expressed Mr. Miller's intent to harm the defendant. The men entered the restaurant, where they again met with Ms. Woodruff and Alexis Watkins. The group eventually decided to leave the restaurant and go riding around. Mr. Dubose said that they traveled in three separate cars through various areas of Knoxville before the defendant telephoned Mr. Dubose and said, "'Let's ride on the east side.'" They eventually drove down Porter Avenue in front of Mr. Miller's mother's house. He said that as they passed the residence, they heard a single gunshot. Mr. Dubose said that he stopped, and the others followed suit. As they stood discussing the gunshot, Mr. Dubose saw Mr. Miller drive up in his Tahoe. Mr. Miller and the defendant had a conversation that Mr. Dubose could not overhear. Mr. Miller knocked on the passenger's side window of Ms. Woodruff's car, and she sped away. Mr. Miller then got into his car and followed her.

At that point, the defendant told Mr. Dubose to go to the defendant's grandmother's house, and Mr. Dubose agreed. Mr. Dubose testified that when he arrived at the defendant's grandmother's residence, he saw the defendant with "this big gun in his hand." He described the weapon as an "AK." Shortly thereafter, Ms. Woodruff arrived and told the men that she was "missing her center pieces off her car" and believed she had lost them "when [her] baby daddy was chasing " her. Mr. Dubose and the defendant agreed to help Ms. Woodruff look for the missing pieces of her car. Mr. Dubose said that the defendant told Mr. Dubose to drive his car, and the defendant rode as a passenger in the Infiniti. Mr. Dubose recalled that they found the center pieces on Speedway Circle and that the defendant then directed him to drive down Porter Avenue. Mr. Dubose said that he did as directed, and when he pulled parallel to Mr. Miller's vehicle, the defendant jumped out of the still-moving car. Mr. Dubose described what happened next: "You heard the first shot, boom. You hear about four to five more. He get in the car, . . . he like, 'Pull off.' I'm

like what'd you do that for? He's like – he didn't really give me no explanation."

The defendant directed Mr. Dubose to call the defendant's cellular telephone and to drive to the defendant's mother's house and park the car in the back. Mr. Dubose said that he did as instructed. They were unable to locate the defendant's cellular telephone. When they arrived at the defendant's mother's house, the defendant walked across the yard and took keys from his sister, who lived next door, and put the gun inside his sister's car. He then asked Mr. Dubose to retrieve his telephone, but Mr. Dubose refused. Mr. Dubose then drove toward his grandmother's house. As he drove, Mr. Dubose received a telephone call from Mr. Quince, who said, "'They said Sam was shooting at [Mr. Miller] and hit Muffin.'" Mr. Dubose relayed the information to the defendant, who then telephoned Ms. Woodruff. Mr. Dubose said that he implored the defendant to "do something with that and let them know it was an accident and you didn't mean to do it." The defendant, in response, told him, "'Everything will be all right. You're going to be cool.'"

Mr. Dubose said that after dropping the defendant off, he went back to his mother's house, where he telephoned Mr. Quince and asked him to come pick him up. Mr. Dubose testified that he met with the defendant the next day, and the defendant said, "'Everything cool. Everything gonna to be alright. You gonna be good.'" The defendant told Mr. Dubose that Mr. Dubose's fingerprints would not be found inside the defendant's car even though he had been driving. He said that he believed the defendant until he was arrested. Mr. Dubose admitted that he did not initially tell the police the truth, saying that he was "hard headed."

Knoxville Police Department ("KPD") Officer Charles Lee reported to the Porter Avenue scene at approximately 3:00 a.m. While there, an individual standing in the front yard informed him that she had received a call from Ms. Woodruff and was still on the telephone with her. That individual placed her telephone on speaker, and the officer overheard their conversation. Based upon that conversation, Officer Lee traveled to an apartment complex to interview Ms. Woodruff. Ms. Woodruff agreed to be transported to the police station, and Officer Lee had her vehicle towed to the impound lot.

Once he arrived at the station, Officer Lee questioned Mr. Miller first. Mr. Miller identified the shooter from a photograph array. Ms. Woodruff was not as cooperative and did not provide police with a statement. She did, however, give the officer permission to examine her cellular telephone.

The defendant arrived at the police station after learning that officers wished to speak with him. Officer Lee testified that he provided the defendant with *Miranda* warnings, and the defendant signed a written waiver of his rights before providing a

statement. The defendant denied any involvement in the offense, telling the officer that he had been at his grandmother's house. The defendant also claimed that he did not often drive the orange and green Infiniti because his driver's license had been revoked. The defendant insisted that he was at his grandmother's house because he was under a curfew as a condition of his probation.

Forensic examination of a broken cellular telephone discovered in the street in front of the Porter Avenue residence established that the telephone belonged to the defendant.

Doctor Steven Cogswell of the Knox County Medical Examiner's Office performed the autopsy of Ms. Dotson at 1:30 p.m. on June 9, 2010. Ms. Dotson suffered two gunshot wounds to the right side of her back, one on the "upper back in the area of the tip of the shoulder blade and another that was basically at the waist level." The wounds were atypical in that they were "not the usual round to oval hole," but, instead, both consisted of "two small entrance wounds right next to each other that were irregular in shape and had an irregular border." The shape of the entrance wounds suggested "that the bullets when they struck her were not intact, stable bullets" but "had hit something first and had actually started to breakup and destablilize and fragment and then they struck her body." One wound was "more circular and round" while "[t]he other is almost slit-like." Doctor Cogswell said that he "would expect" that the bullet that caused the lower gunshot wound had traveled through something less substantial, such as the handrail of the porch, and that the bullet that caused the higher gunshot wound had traveled through something more substantial, such as the exterior wall of the house.

The bullet fragments of the lower wound struck the spine at the lowest spinal vertebrae but did not penetrate the spinal chord, and the bullet core traveled into the pelvis but did not break the bone. Doctor Cogswell testified that although the victim would likely have suffered long term effects from that wound, it would not have caused her death.

The bullet from the upper wound, however, "actually entered the chest cavity, went through the right lung, and severed branches of the pulmonary vein which takes all the blood from the right lung back to the heart." The bullet from that wound also struck her esophagus. Doctor Cogswell said that the damage occasioned by the higher wound "caused her to bleed to death internally." Neither wound, he said, would have caused a lot of external bleeding.

Doctor Cogswell noted that the type of bullet, a 7.62 "times 39," is "considered an intermediate power cartridge" and is used "in any of the assault rifle class of firearms," particularly "the AK series as well as the SKS series rifles." He opined that had the

defendant used a handgun as opposed to an assault rifle, the victim would not have suffered the same injuries.

At the conclusion of this testimony, the State rested.

Ms. Woodruff testified on behalf of the defendant that on June 8, 2010, she was "in Knoxville riding around" with "Alexis Watkins and her son." She said that she and Ms. Watkins "met up" with Mr. Dubose and the defendant and then traveled to the liquor store. Ms. Woodruff testified that Mr. Miller, the father of her infant son and to whom she referred as her "Baby Dizzle," telephoned to express his furor at the defendant's being in the car with her because she had been romantically involved with the defendant approximately one year before the shooting. She said that she "wasn't too much worried" about Mr. Miller's anger because she "wasn't in a relationship with Antonio Miller at the time. . . . I had just crossed that out."

Ms. Woodruff eventually drove the defendant and Mr. Dubose back to the defendant's grandmother's house. She testified that after she dropped the men off, Mr. Miller telephoned her again and said, "'[Y]ou tell Lil Sam that he told someone that I was a snitch and I was working for the Feds and when I see him it's on sight.'" Ms. Woodruff explained that the statement expressed Mr. Miller's desire "to fight him or harm him." She said that she relayed the threat to the defendant when she met him and Mr. Dubose at Buffalo Wild Wings later that evening.

After they ate, the group got into three separate cars and "rode around Knoxville just from hood to hood." Ms. Woodruff said that after traveling through various government housing projects in the greater Knoxville area for approximately 30 minutes, the caravan drove down Porter Avenue for "[n]o reason at all." She denied calling Mr. Miller to tell him that they would be driving by his residence. Nevertheless, she claimed that Mr. Miller came outside as they drove by, and Ms. Woodruff heard a gunshot. She said that they drove away and stopped at "Speedway Circle." As they sat discussing the gunshot, Mr. Miller drove up. Ms. Woodruff said that Mr. Miller confronted the defendant but that "[t]here was no fight whatsoever." Mr. Miller then got into his car and tried to "chase" her. Ms. Woodruff said that the defendant and Mr. Dubose left.

After the "chase," Ms. Woodruff noticed that the "center piece" from her rims was missing, so she telephoned the defendant to ask him to help her look for them. After locating the missing items on Speedway Circle, the group, traveling then in two cars, drove down Porter Avenue. Ms. Woodruff recalled that Mr. Dubose, who was driving the defendant's car, stopped, and the defendant got out of the car. She claimed that Mr. Miller, who had been standing outside, walked toward the defendant. At that point, she said, she

heard gunfire but did not see the defendant with a gun. Ms. Woodruff maintained that it was "at least five minutes" from the time the defendant exited the car to the time she heard gunfire. Ms. Woodruff denied getting out of her car and said that she saw no one on the porch of the Porter Avenue residence.

During cross-examination, Ms. Woodruff acknowledged that she and Mr. Miller argued via telephone throughout the night and admitted that she was aware that Mr. Miller was home when the group decided to drive down Porter Avenue on the first occasion. Ms. Woodruff conceded that she never actually saw Mr. Miller with a gun. Ms. Woodruff claimed that she feared Mr. Miller but admitted that despite that fear, she chose to drive down Porter Avenue after locating her missing center pieces. She also admitted that despite her claimed fear of Mr. Miller, she stopped her car when Mr. Dubose stopped even though her car was in front of his and she could have driven on.

Ms. Woodruff admitted that she spoke via telephone with both the defendant and Mr. Dubose after the shooting, but she claimed that she could not recall the substance of either conversation. Ms. Woodruff acknowledged that she did not cooperate with the investigation of the offenses. She also admitted that she had spoken to the defendant on the telephone during the pendency of the case and had visited him in jail on more than one occasion. She claimed, however, that she could not recall whether she had discussed the details of the case with the defendant.

Alexis Watkins testified that she had been a friend of Ms. Woodruff since elementary school, that she knew Mr. Miller as Ms. Woodruff's "baby daddy," and that she knew Mr. Dubose and the defendant as friends of Ms. Woodruff. Ms. Watkins confirmed that she rode around with Ms. Woodruff, Mr. Dubose, and the defendant during the evening hours of June 8, 2010, and that the group eventually went to eat at Buffalo Wild Wings. Ms. Watkins said that while the group was at the restaurant, Mr. Miller telephoned Ms. Woodruff "and was like, somebody calling somebody a snitch, and that he needed to talk to Little Sam about somebody calling him a snitch." Ms. Watkins said that after they ate, the group decided to drive through all of the government housing projects in Knoxville. She said that they eventually drove down Porter Avenue and that as they did, they were "[p]arading, like swerving in and out." She explained, "All the projects we went through we was swerving down the street." Ms. Watkins said that as they traveled down Porter Avenue, she saw Mr. Miller come out of his house and then heard gunfire. She recalled that Mr. Miller then chased the group in his car. When they stopped, "him and Little Sam had had some words with each other." Then Mr. Miller chased Ms. Woodruff for "[a] little minute."

Ms. Watkins said that Ms. Woodruff's rim fell off during the chase, and they had to go back and look for it. She recalled that Ms. Woodruff telephoned the defendant and

asked him to come help her look for the missing pieces. After locating the missing items, the group drove down Porter Avenue again. She described what happened next: "I had seen Little Sam getting out of his car or whatever. And so I knew something was about to happen because I knew Antonio had had a gun, and – cause I heard gunfire, so I had ducked my head, and I heard shots." Ms. Watkins claimed that she saw Mr. Miller "reaching for something" and that she did not see the defendant with a gun.

During cross-examination, Ms. Watkins admitted that she refused to identify the defendant as the shooter when interviewed the first time. She acknowledged that she eventually admitted to Detective Lee that the defendant said he was "not going to let it go down that way." Although she initially denied telling the detective that the defendant said that he was going to get a gun after he and Mr. Miller exchanged words at Speedway Circle, she admitted making the statement after being confronted with a recording of her interview with Detective Lee. Ms. Watkins vehemently denied seeing the defendant with an AK-47. She admitted that she did not call 9-1-1 after the shooting and that she and Ms. Woodruff simply returned to her house.

The defendant began his testimony with an apology to Ms. Dotson's grandmother, saying,

> I just wanted to tell you, Ms. Arnette, that I swear, I'm sorry.
> This was never supposed to happen. Never. Y'all was family
> to me, man. I mean, like real family. Come on. Everybody got
> up here to tell a story, but nobody's told the truth. Nobody. So
> I want to tell the truth. I feel like you should hear it from me.
> That's all I wanted to say.

The defendant testified, as did the other witnesses, that he spent the evening hours of June 8, 2010, riding around Knoxville with Mr. Dubose, Ms. Woodruff, and Ms. Watkins. He added that they confined their earlier travels "to the west side," explaining, "I don't ride on the east side too much because they know the car. They're going to pull me over and put me in jail so we ride to the west side." Despite the defendant's desire to travel only on the "west side," the group nevertheless drove "a couple of blocks on the east" after having driven "around on the west side for a little minute." He said that "a little minute" equaled approximately "a couple of hours." At some point, he and Mr. Dubose split up, and the defendant returned to his grandmother's house.

The defendant testified that Mr. Dubose came to the defendant's grandmother's house later that evening so that they could "chill" because "that's what we do." He said that sometime thereafter, Ms. Woodruff came to his grandmother's house and asked the men if

-10-

they wanted to "ride" with her. He said that they agreed, explaining, "I mean, this is what we do. When there ain't nothing to do we ride around. So me and Akeem got in the car with her. We're riding. I mean, Jaz rides everywhere so we're just riding with Jaz, you know what I mean? Nonchalantly just riding with Jaz." He said that the group went to the liquor store, where he purchased liquor for the women, and then returned to his grandmother's house because his "curfew was coming up." They stayed at the defendant's grandmother's house "kicking it" with the defendant's mother and aunts before the women and Mr. Dubose left.

The defendant said that Mr. Dubose called him later and persuaded him to go to Buffalo Wild Wings, saying, "'Man, everybody calling me saying everybody going to be there. It's going to be done.'" The defendant told Mr. Dubose to wait until after the defendant's "curfew call" and then he would go. The defendant said that he left after his curfew call and went to his mother's house on Porter Avenue to change clothes. While he was there, Ms. Woodruff called him and said, "'T.T. just called me wanting your number.'" The defendant testified that he told Ms. Woodruff that he would "holler at him when I see him." He said that she telephoned again a short time later and said, "'T.T. just called me back and was like tell you he's going to kill you. It's on sight. He don't care where he see you. Who you with. If you in the car with me, his son in the car.'" The defendant claimed that because of the threat communicated to him by Ms. Woodruff, he armed himself with "a chopper," which he admitted was an AK-47. He then followed Mr. Dubose to Buffalo Wild Wings.

The defendant said that after the restaurant closed, Ms. Woodruff suggested that they "stunt, parade, or however you want to put it." He testified that he agreed but told Ms. Woodruff to stay behind him because he had no driver's license. When they had finished "swerving" through the housing projects on "the west side," they decided to "hit the east." Ms. Woodruff, he said, took the lead, and Mr. Dubose followed the defendant. He said that they eventually ended up on Porter Avenue, where they continued "stunting everybody, hanging out the windows." They then drove to Speedway Circle, where they parked and discussed plans for the rest of the evening. He claimed that although Ms. Woodruff expressed a desire to "'get drunk,'" he told the others that he wanted to retire for the evening. At that point, their conversation was interrupted by "tires burning or screeching." Ms. Woodruff said, "'Ah, shit, that's my baby daddy.'" The defendant told her to go, and she started to drive away but stopped. The defendant testified that Mr. Miller pulled up to him, rolled his window down, and the defendant asked, "What's up?" Mr. Miller responded, "'Man, you know what's up.'" Similarly enlightening conversation followed until Mr. Miller drove off after Ms. Woodruff. The defendant said that he then told Mr. Dubose that he was going home, and he drove away.

According to the defendant, as he was driving home, he discovered that his cellular telephone was missing. When he stopped to look for it, he saw Ms. Woodruff drive by being chased by Mr. Miller. At that point, the defendant traveled on to his grandmother's house, and Mr. Dubose arrived a short time later and asked if the defendant had heard shots while they were near Speedway Circle. Ms. Woodruff arrived next and also asked if the defendant had heard shots. The defendant said that as they talked, Ms. Woodruff noticed that a piece of her rim was missing, so she asked the men to help her look for it. The defendant said that he told Mr. Dubose to drive the Infiniti, and he rode in the passenger seat.

The defendant said that the group drove down Porter Avenue after finding the missing items because the defendant intended to go to his mother's house, which was also on Porter Avenue, "for a minute." He testified that as they drove, they saw Mr. Miller standing behind his car. The defendant claimed that, in that moment, he was overcome with a sudden desire to discuss and resolve any conflict with Mr. Miller, and told Mr. Dubose to stop the car. He said that he got out of the car and said, "T.T., let me holler atcha. I need to talk to you." The defendant claimed that when Mr. Miller did not respond, the defendant implored him to talk out their issues. He said that Mr. Miller then said, "'What's up? What's up?'" while "hugging the side of his Suburban." The defendant said that he took a step back toward the car because Mr. Miller had his right arm "all the way down to his side," leading the defendant to believe that he was armed. The defendant claimed that by the time he reached his car, he saw Mr. Miller "fixin' to point his hand up," so he grabbed the AK-47 from the front seat of the Infiniti and began shooting.

The defendant insisted that he "pulled the trigger cause [Mr. Miller] scared the shit out of [him]." The defendant said that he did not aim the assault rifle in any particular direction because he only intended to make Mr. Miller run so that he could get away. The defendant maintained that he did not know anyone was struck by bullets. After firing several rounds, he got back into the car, and Mr. Dubose drove away. The defendant said that they went to the defendant's sister's house, where the defendant got her keys, and the men drove away in her car. He recalled that shortly after he returned to his grandmother's house, his sister telephoned to tell him that "Shauny Muffin" had been shot. The defendant acknowledged that he did not admit his involvement in Ms. Dotson's death, claiming that he was scared. He said that he wanted to talk to Ms. Dotson's uncle, Buster, and tell him what happened, but his aunt told him to let the family grieve and talk to them later. The defendant insisted that the shooting "was a real big misunderstanding" and an accident.

During cross-examination, the defendant said that he armed himself with the AK-47, which he had been keeping for a friend sentenced to a lengthy term of incarceration, because he believed, based on the threat communicated to him by Ms. Woodruff, that Mr. Miller intended to harm him. The defendant conceded that although he claimed to fear for

his life so much that he needed to arm himself with an assault rifle, he drove past Mr. Miller's house a number of times on June 8 and 9. He initially claimed that the trips down Porter Avenue were prompted by a desire to visit with his mother and sister but then acknowledged that the women, both of whom worked, would be in the bed at 2 a.m. The defendant said that he only grabbed the gun from the car and fired because he believed that Mr. Miller had a gun but admitted that he never saw Mr. Miller with a gun. The defendant said that he shot that particular AK-47 for the first time on the night of the shooting but admitted that he had fired another such weapon before, explaining, "Everybody done shot a gun on a holiday." He said that after the shooting he put the gun "back under [his] momma porch."

The defendant acknowledged that his being "out swerving" and "having fun" violated the law because he did not possess a driver's license and the terms of his probation because he was out past his court-imposed curfew. The defendant conceded that he continued to drive without a driver's license, claiming that he did not want to rely on others for his transportation needs. He admitted, however, that he had no real transportation needs because he had no job and was not attending school.

The defendant admitted that he had made well over 100 telephone calls while incarcerated pending trial and that he had not tried to contact the victim's family to apologize. Although he maintained that he had never denied being the shooter, he acknowledged that he told "certain people" that he was at his grandmother's during the shooting.

Based upon this proof, the jury convicted the defendant as charged of the first degree premeditated murder of Ms. Dotson, the felony murder of Ms. Dotson, the attempted first degree murder of Mr. Miller, employing a firearm during the commission of a dangerous felony, and driving while his driver's license was revoked. In counts three and four of the indictment, the jury convicted the defendant of the lesser included offenses of the attempted second degree murders of Ms. Christopher and Zymarius Davenport. The trial court imposed an automatic sentence of life for the merged first degree murder convictions, a sentence of 25 years for the conviction of attempted first degree murder, sentences of 12 years for the convictions of attempted second degree murder, a sentence of six years for the conviction of employing a firearm during the commission of a dangerous felony, and a sentence of six months for the conviction of driving on a revoked license. The court ordered partially consecutive service of the sentences, for a total effective sentence of life plus 31 years.

The defendant filed a timely motion for new trial or judgment of acquittal, which was granted in part and denied in part. The trial court concluded that the evidence was insufficient to support the defendant's convictions of attempted second degree murder

because the doctrine of transferred intent could not be applied to attempt offenses. Accordingly, the court set aside the jury verdicts in counts three and four and entered judgments of acquittal. The court also concluded that error in the jury instructions relative to the conviction of employing a firearm during the commission of a dangerous felony entitled the defendant to a new trial on that offense. The court imposed the defendant's convictions of first degree murder, attempted first degree murder, and driving on a revoked license.

In this appeal, the State contends that the trial court erred by setting aside the jury verdicts of attempted second degree murder and entering judgments of acquittal because the evidence was sufficient to support those convictions as well as the defendant's convictions of first degree murder and attempted first degree murder.[3] The defendant contends that the trial court did not err by setting aside the jury verdicts of attempted second degree murder and entering judgments of acquittal because the evidence was insufficient to support those convictions. The defendant also asserts that the evidence was insufficient to support his convictions of first degree murder and attempted first degree murder. We consider the issues in turn.

## I. Transferred Intent

The State contends that the trial court erred by setting aside the jury verdicts of attempted second degree murder and entering judgments of acquittal. The defendant contends that the trial court acted appropriately.

At the hearing on the defendant's motion for new trial, the trial court set aside the jury verdicts of second degree murder and entered judgments of acquittal, concluding:

> Counts three and four are different, and that's because the transferred intent that gets us to Ms. Do[t]son doesn't apply in the rules of – in the laws pertaining to attempt. In that situation, the shooter shoots at A, accidentally hits B, but doesn't hit C or D at all. There is no transfer of an attempt to shoot one person over to an attempt to shoot someone else. The transferred intent gets us the homicide but not the attempt. For those reasons the Court will find that the evidence does not support the convictions in counts three and four. And at this point, the Court would enter judgments of acquittal. The Court has to find

---

[3]The State does not contest the trial court's grant of a new trial on the charge of employing a firearm during the commission of a dangerous felony.

-14-

the evidence did not support the conviction.

The common law doctrine of transferred intent, which provides that "a defendant who intends to kill a specific victim but instead strikes and kills a bystander is deemed guilty of the offense that would have been committed had the defendant killed the intended victim," *Millen v. State*, 988 S.W.2d 164, 166 (Tenn. 1999) (citing 2 Charles E. Torcia, *Wharton's Criminal Law* § 146 (15th ed. 1994); 1 Wayne R. LaFave & Austin W. Scott Jr., *Substantive Criminal Law* § 3.12(d) (1986)), has enjoyed a checkered history in this state, *see Millen*, 988 S.W.2d at 166-67 (recounting history of application of transferred intent doctrine). In *Millen*, our supreme court concluded that "the transferred intent rule has little application under our modern statutory law." *Millen*, 988 S.W.2d at 167. The court observed that "[a] plain reading" of the current version of the first degree murder statute "indicates that a defendant's conscious objective need not be to kill a specific victim. Rather, the statute simply requires proof that the defendant's conscious objective was to kill a person, *i.e.*, 'cause the result.'" *Id.* at 168. The court held that so long as "the evidence demonstrates that the defendant intended to 'cause the result,' the death of a person, and that he did so with premeditation and deliberation, then the killing of another, even if not the intended victim (*i.e.*, intended result), is first degree murder." *Id.*

This court has expanded the ruling in *Millen* to convictions of attempted first degree murder, *see, e.g.*, *State v. Fabian Claxton*, No. W2009-01679-CCA-R3-CD (Tenn. Crim. App., Jackson, Mar. 7, 2011), and attempted second degree murder, *see, e.g.*, *State v. Horace Demon Pulliam*, No. M2001-00417-CCA-R3-CD (Tenn. Crim. App., Nashville, Jan. 23, 2002); *State v. Tarrence Parham*, No. W2009-00709-CCA-R3-CD (Tenn. Crim. App., Jackson, July 26, 2010), concluding that the reasoning in *Millen* was equally applicable to those offenses.

The defendant acknowledges our previous holdings but argues that this case is distinguishable because, unlike the victims in those cases, Ms. Christopher and Zymarius Davenport did not suffer any injury as a result of the defendant's firing the AK-47 toward the house. In our view, this is a distinction without a difference. The State need not show that a victim suffered any injury to support a conviction of attempted second degree murder. *See, e.g.*, *State v. Rush*, 50 S.W.3d 424, 430 (Tenn. 2001). Accordingly, we hold that the trial court erred by relying on the common law doctrine of transferred intent to set aside the jury verdicts of attempted second degree murder and enter judgments of acquittal.

Having concluded that the trial court so erred, we now consider whether the evidence was sufficient to support the defendant's convictions of first degree murder,

-15-

attempted first degree murder, and attempted second degree murder.[4]

## *II. Sufficiency*

We review the defendant's challenge to the sufficiency of the evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Arguing that "the State's theory of intent to commit first degree felony murder relied upon proving an intent to murder Antonio Miller," the defendant asserts that the State failed to establish that he acted with premeditation because he "had no reason to want to murder [Mr.] Miller and had never expressed any such inclination prior to the shooting."

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another" and "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder." T.C.A. § 39-13-202(a)(1)-(2) (2006).

As used in the statute,

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully

---

[4]The defendant does not challenge his conviction of driving on a revoked license.

considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007)*; see also State v. Johnny Wright*, No. 01C01-9503-CC-00093 (Tenn. Crim. App., Nashville, Jan. 5, 1996) (citing LaFave and Scott, *Substantive Criminal Law* § 7.7 (2d ed. 1986)). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g.*, *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

"Second degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210(a)(1).

"A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." *Id.* § 39-12-101(a)(2).

Here, the evidence established that the defendant, upset about his earlier confrontation with Mr. Miller, armed himself with an AK-47 and traveled to Mr. Miller's Porter Avenue residence. Seeing Mr. Miller standing outside, the defendant jumped from the still-moving Infiniti and fired a number of shots from the assault weapon toward Mr. Miller, who had been standing on the porch talking to Ms. Dotson and Ms. Christopher. Eight-month-old Zymarius Davenport, who was outside with the girls because he had awoken fussy and hot, sat directly in the defendant's line of fire.

Proof that the defendant went to the residence with the settled purpose to kill Mr. Miller was overwhelming, thus supporting his conviction of the attempted first degree murder of Mr. Miller. The defendant's intentional and premeditated attempt on Mr. Miller's life coupled with Ms. Dotson's tragic death sufficiently established both that the defendant

killed Ms. Dotson during the commission of the attempted first degree murder of Mr. Miller and that the killing of Ms. Dotson was intentional and premeditated. Thus, the evidence was sufficient to support the conviction of the first degree premeditated murder of Ms. Dotson and the felony murder of Ms. Dotson.

Similarly, that the defendant knowingly fired a high caliber assault rifle in the general direction of Mr. Miller, who only moments earlier had been standing on the porch with Mses. Dotson and Christopher and the baby, supports his convictions of the attempted second degree murder of Ms. Christopher and Zymarius. Although the defendant claimed that he did not travel to the Porter Avenue residence to harm Mr. Miller, that he did not aim the gun in any particular direction, and that he did not even see the girls or the infant on the porch, the jury rejected these claims, as was its prerogative.

*Conclusion*

Because the trial court erred by relying upon the common law doctrine of transferred intent to set aside the jury verdicts of attempted second degree murder and enter judgments of acquittal and because the evidence was sufficient to support those convictions, the judgment of the trial court in counts three and four is reversed. The judgments reflecting jury verdicts of attempted second degree murder and the 12 year sentences imposed by the trial court for those convictions are reinstated. The defendant's convictions of first degree murder and attempted first degree murder are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE